UNITED STATES DISTRICT COURT

DISTRICT OF HAWAII

| | |
|---|---|
| SAM MONET,<br><br>　　　　　　Plaintiff,<br><br>　　vs.<br><br>STATE OF HAWAII, SHARON MORIWAKI, EDWARD UNDERWOOD, GORDON WOOD, ATTORNEY GENERAL STATE OF HAWAII, UNITED STATES OF AMERICA OFFICE OF INSPECTOR GENERAL, AND  DOE DEFENDANTS 1-20,<br><br>　　　　　　Defendants. | CIV. NO. 21-00368 LEK-KJM |

**ORDER: DENYING PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT AS TO COUNT V; GRANTING DEFENDANT
GORDON WOOD'S MOTION FOR SUMMARY JUDGMENT; AND GRANTING
DEFENDANT EDWARD UNDERWOOD'S MOTION FOR SUMMARY JUDGMENT**

Before the Court are: pro se Plaintiff Sam Monet's

("Plaintiff") Motion for Partial Summary Judgment as to Count V

("Plaintiff's Motion"), filed on April 10, 2023; Defendant

Gordon Wood's ("Wood") Motion for Summary Judgment ("Wood's

Motion"), filed on May 31, 2023; and Defendant Edward

Underwood's ("Underwood") Motion for Summary Judgment

("Underwood's Motion"), also filed on May 31, 2023.  [Dkt.

nos. 120, 150, 151.]  Underwood and Wood ("Defendants") filed

their memorandum in opposition to Plaintiff's Motion on May 24,

2023 ("Opposition to Plaintiff's Motion"), and Plaintiff filed a

memorandum in opposition to Wood's Motion and Underwood's Motion

on June 15, 2023 ("Opposition to Defendants' Motions"). [Dkt. nos. 143, 153.] Plaintiff filed his reply in support of Plaintiff's Motion on May 30, 2023, and, on June 29, 2023, Wood and Underwood each filed a reply in support of his motion. [Dkt. nos. 146, 155, 156.] The Court finds these matters suitable for disposition without a hearing pursuant to Rule LR7.1(c) of the Local Rules of Practice for the United States District Court for the District of Hawaii ("Local Rules").

On August 11, 2023, an entering order was issued informing the parties of the Court's rulings on the motions. [Dkt. no. 157.] The instant Order supersedes that entering order. For the reasons set forth below, Wood's Motion is granted because he is entitled to legislative immunity, and Underwood's Motion is granted because he is entitled to qualified immunity. In light of those rulings, Plaintiff's Motion is denied as moot.

## BACKGROUND

Plaintiff initiated this action in August 2021. See Complaint for Declaratory, Compensatory and Injunctive Relief, and Civil Penalties ("Complaint"), filed 8/30/21 (dkt. no. 1). The operative pleading is Plaintiff's Second Amended Complaint, filed on June 25, 2022. [Dkt. no. 65.] Underwood and Wood, each in his individual capacity, are the only defendants named

in the Second Amended Complaint.  See id. at ¶¶ 4-5.  The Second

Amended Complaint asserts the following claims: a 42 U.S.C.

§ 1983 claim alleging violations of Plaintiff's right to

religious freedom under the First, Fourth, and Fourteenth

Amendments to the United States Constitution ("Count I");[1] [id.

at ¶¶ 204-13;] a § 1983 claim alleging violations of Plaintiff's

right to be free from the deprivation of property without due

process under the First Amendment ("Count II"); [id. at ¶¶ 214-

22;] a § 1983 claim alleging violations of Plaintiff's equal

protection rights under the First and Fourteenth Amendment

("Count III"); [id. at ¶¶ 223-32;] a claim for damages under

"HRS §13-200-10(c)(4)" and "HRS §234-8(a)(1) and (2)"

("Count IV");[2] [id. at ¶ 239, ¶¶ 233-50;] and a § 1983 claim

alleging violations of his First Amendment right to petition the

---

[1] Count I also cites 18 U.S.C. §§ 241 and 242.  These are
criminal statutes that do not give rise to civil liability.

[2] There is no § 13-200-10(c)(4) nor a § 234-8 in the Hawai`i
Revised Statutes.  Count IV is similar to Count IV of
Plaintiff's First Amended Complaint, [filed 2/11/22 (dkt.
no. 36),] but the citations were to "HAR §13-234-8" and "HRS
§200-10(c)(4)."  See First Amended Complaint at ¶¶ 181, 183.
Because Plaintiff is proceeding pro se and his filings must be
liberally construed, see Erickson v. Pardus, 551 U.S. 89, 94
(2007) (per curiam), Count IV of the Second Amended Complaint
will be liberally construed as based upon Haw. Admin. R. § 13-
234-8(a)(1) and (2) and Haw. Rev. Stat. § 200-10(c)(4).
Further, like Count IV the First Amended Complaint, Count IV is
liberally construed as an abuse of process claim.  See Order
Granting in Part and Denying in Part the State Defendants'
Motion to Dismiss [036] First Amended Complaint Filed
February 11, 2022, filed 5/31/22 (dkt. no. 62) ("5/31/22
Order"), at 30, also available at 2022 WL 1748442.

government for the redress of grievances and his Fourteenth Amendment right to due process ("Count V"), [id. at ¶¶ 251-79].

During the period relevant to this case, Plaintiff was a live-aboard permittee at the Ala Wai Small Boat Harbor ("AWSBH").  See Plaintiff's Concise Statement of Fact Pursuant to Local Rule 56.1 in Support of Motion for Partial Summary Judgment as to Count V, filed 5/10/23 (dkt. no. 127) ("Plaintiff's CSOF"), at ¶ 1; State Defendants' Concise *Counter*-Statement of Facts, filed 5/24/23 (dkt. no. 142) ("Defendants' Responsive CSOF"), at ¶ 1 (stating Plaintiff's ¶ 1 is undisputed, assuming the relevant period is 2021).  Plaintiff's vessel was moored at AWSBH slip 741, and he was a co-director of a non-profit organization that owned a vessel moored at AWSBH slip 740.  Further, Plaintiff has not been evicted, and his AWSBH permits have been renewed.  See State-Defendant Wood's Concise Statement of Facts, filed 5/31/23 (dkt. no. 148) ("Wood's CSOF"), at ¶¶ 2-4; State-Defendant Underwood's Concise Statement of Facts, filed 5/31/23 (dkt. no. 149) ("Underwood's CSOF"), at ¶¶ 2-4;[3] see also Defendants' Responsive CSOF, Decl.

_____

[3] Plaintiff was required to file, in connection with his opposition to Wood's Motion and Underwood's Motion, "a single concise statement that admits or disputes each fact set forth in the movant's concise statement."  See Local Rule 56.1(e).  Plaintiff did not file a concise statement of facts with his Opposition to Defendants' Motions.  However, Plaintiff's Opposition to Defendants' Motions responds to some of the

(. . . continued)

of Corey S. Fujioka ("Fujioka Decl."),[4] Exh. 6 (Plaintiff's Harbor Use Permit, Principal Habitation Permit, and Application for Principal Habitation Permit for each of the years 2020-21, 2021-22, and 2022-23) (dkt. no. 142-5).

Wood was also a live-aboard permittee at the AWSBH from approximately 2009 until October 2021. He sold his vessel in 2023. Since 2018, Wood has been employed as a Public Works Manager for the State of Hawai`i Department of Accounting and General Services. However, he states the events at issue in this case are unrelated to his employment. [Wood's CSOF, Decl. of Gordon S. Wood ("Wood Decl.") at ¶¶ 2-3.]

Wood was the coordinator of the AWSBH Citizen's Patrol ("CP") from 2009 to 2016, and he and his wife continued to participate in the group after that. [Id. at ¶¶ 5-6.] The CP

statements in Wood's CSOF and Underwood's CSOF. See, e.g., Opp. to Defendants' Motions at 2 (responding to Underwood's csof at ¶ 17). Plaintiff's Opposition to Defendants' Motions will be liberally construed as Plaintiff's response to the portions of Wood's CSOF and Underwood's CSOF to which the opposition directly responds. Plaintiff is deemed to have admitted any statement from Wood's CSOF or Underwood's CSOF that is not directly contested in Plaintiff's Opposition to Defendants' Motion. See Local Rule LR56.1(g) ("For purposes of a motion for summary judgment, material facts set forth in the movant's concise statement will be deemed admitted unless controverted by a separate concise statement of the opposing party.").

[4] Corey Fujioka works for the State of Hawai`i Department of Land and Natural Resources ("DLNR") Division of Boating and Ocean Recreation ("DOBOR"). He is the AWSBH Harbor Master. [Fujioka Decl. at ¶ 1.]

"took regular walks through the AWSBH and attempted to foster solutions for improvements to the conditions at AWSBH." [Id. at ¶ 5.]  Wood was part of an AWSBH working group ("WG") that was created by Senator Sharon Moriwaki during 2021.[5]  See id. at ¶¶ 7-8.  The WG was intended to bring together "private citizens like the CP members, as well as representatives of the DOBOR to work towards developing proposed legislation to improve the safety and cleanliness of the harbor" and "to address problems and encourage enforcement of rules to improve the harbor; improve communication between DOBOR and stakeholders, generate potential legislation to address the problems, and encourage community-based solutions to problems."  [Moriwaki Decl. at ¶¶ 8-9.]  The WG did ultimately propose legislation to Senator Moriwaki in 2021.  See id. at ¶ 12; id., Exh. 28-32 (email messages between Wood and Senator Moriwaki, dated from 11/14/21 to 12/14/21, transmitting and discussing drafts of proposed legislation) (dkt. nos. 148-30 to 148-34).

I.   **Evidence Regarding Plaintiff's Claims Arising from the Removal of His Property**

      The Principal Habitation Permit states: "The PERMITTEE agrees to comply with all Hawaii Administrative Rules regarding small boat harbors."  [Fujioka Decl., Exh. 6 (dkt. no. 142-5) at

_____

      [5] In 2018, Sharon Moriwaki was elected as the Senator for District 12, which includes the AWSBH.  [Wood's CSOF, Decl. of Senator Sharon Y. Moriwaki ("Moriwaki Decl.") at ¶¶ 1, 3.]

PageID.2963, PageID.2967, PageID.2971 (emphasis in originals).]

Haw. Admin. R. § 13-232-40(b) states:

> Every vessel and all other personal property and facilities at a small boat harbor shall be kept in such a condition of repair, maintenance, neatness, and orderliness so as not to constitute a common nuisance, substantial danger to person or property, or obstruction to proper public use and to be in conformity with these rules, the Hawaii state boating law, the rules of the department of health, and all other applicable state and federal laws.

Haw. Admin. R. § 13-232-41 stats:

> No person shall store, place, leave, deposit, or abandon any vessel, structure, supplies, material, equipment, gear, object, or substance on catwalks, piers, sidewalks, roads, parking areas, or any other public area at a small boat harbor, except vessels or objects may be stored:
>
> > (1)  In areas set aside by the department for storage purposes; or
> >
> > (2)  Upon prior consent by the department.

Underwood argues that, in spite of those rules, current and former AWSBH tenants have left plants and personal items in areas that are considered public property.  [Underwood's CSOF at ¶ 7 (citing Defendants' Responsive CSOF, Decl. of Melissa D. Goldman ("Goldman Decl."), Exh. 33 (transcript of 12/15/22 Deposition of Sam Monet ("Plaintiff Depo. Trans.")) (dkt. no. 142-7) at 64:17-19, 159:11-12, 107:17-18, 84:12-14, 85:3-7, 17-18; DeGuzman Decl. at ¶ 15.a & Exhs. 3-5 (photos taken on 7/14/21 of Plaintiff's slips, nos. 740 and 741) (dkt. nos. 148-7

to 148-9); DeGuzman Decl. at ¶ 15.b & Exh. 20 (dkt. no. 148-23)
at 1-3 (photographs taken on 7/14/21 of slip nos. 738 and 739);
DeGuzman Decl. at ¶ 16 & Exh. 21 (dkt. no. 148-24) at 1 (one of
the photographs taken on 7/22/21 of the slips in the "600" row
with storage violations)).]

 Underwood states:

> Trash left at AWSBH has been a problem for
> years, and the items left there include such
> things as car batteries, hazardous materials,
> trash, construction materials, abandoned items
> belonging to prior tenants, and items removed
> from the water and placed on the docks and piers.
> These items are unsightly and create a health and
> safety risk for tenants, permittees, harbor
> staff, and members of the general public.

[Defendants' Responsive CSOF, Decl. of Edward R. Underwood
("Underwood Decl.") at ¶ 4.[6]]  AWSBH cleanups are held
periodically, but the frequency is constrained by the limited
available resources.  See id. at ¶ 8.

 **A.** **The Cleanup on July 21, 2021**

 Fujioka states that, "[a]pproximately one-week before
July 21, 2021, DOBOR staff had disseminated and posted written
notice to AWSBH tenants reminding them of the rules prohibiting
storage of personal items on the docks and piers."  [Fujioka

---

 [6] At all relevant times, Underwood has been the
Administrator of DOBOR.  [Underwood Decl. at ¶ 1.]  His duties
include overseeing all small boat harbors in Hawai`i, including
the AWSBH.  [Id. at ¶ 3.]

Decl. at ¶ 5.]  Fujioka states Plaintiff must have received the July 14, 2021 notice because Plaintiff has submitted it as an exhibit in this case.  See id. & Exh. 2 (dkt. no. 148-6) at 1.[7]

At Fujioka's direction, "on July 21, 2021, a group of four DOBOR Employees and two State trucks were deployed the '700' row of the AWSBH to remove trash and personal items improperly stored on the docks and piers of those rows" ("7/21/21 Cleanup").  [Fujioka Decl. at ¶ 7.]  Isaac DeGuzman, a DOBOR Harbor Agent II, and Harbor Agent Florence Holtz were two of the four employees who participated in the 7/21/21 Cleanup. [Defendants' Opp. CSOF, Decl. of Isaac K. DeGuzman ("DeGuzman Decl.") at ¶¶ 1, 5.]

Underwood had instructed that, when the cleanup occurred, the staff was to start with the "800" and "700" rows and then turn to the "600" row.  [Underwood Decl. at ¶ 10.] Fujioka admits that there was a miscommunication between himself and Underwood, and that Underwood believed there would be two separate notices given before the clean-up.  [Fujioka Decl. at ¶ 7; see also Underwood Decl. at ¶ 9 ("During the 2021 time-frame . . . , I asked DOBOR staff to provide two successive notices prior to removing any personal items improperly stored

---

[7] Defendants have also submitted a blank form of the notice that Plaintiff received "as a reference tool, due to the poor quality of the copy offered by Plaintiff . . . ."  [Fujioka Decl. at ¶ 5; id., Exh. 2 (dkt. no. 148-6) at 2.]

on the docks and catwalks[.]"); id. at ¶ 11 (stating Underwood
was unaware that the cleanup would occur on July 21, 2021
because the second notice had not yet been given).  Thus,
Underwood was not present at the 7/21/21 Cleanup.

Fujioka did not participate in the 7/21/21 Cleanup
because he was on sick leave on July 21 and 22, 2021.[8]  [Fujioka
Decl. at ¶ 8; id., Exh. 7 (screenshot taken by Fujioka of
internal personnel records) (dkt. no. 148-10).]  DeGuzman states
he does not recall either Fujioka or Underwood being present on
the day of the 7/21/21 Cleanup.  [DeGuzman Decl. at ¶ 5.]
DeGuzman recalls that the "800" row had been cleaned previously,
and therefore the 7/21/21 Cleanup started with the "700" row.
[Id. at ¶ 6.]  The crew cleaned approximately twenty to thirty
slips on July 21, 2021, and they stopped when the trucks were
full.[9]  [Id. at ¶¶ 7-8.]  The testimony in Holtz's declaration,
is the same, except that she states the 7/21/21 Cleanup started
with the "600" row.  See Wood's CSOF, Decl. of Florence M. Holtz

---

[8] Fujioka acknowledges that, in a declaration filed earlier
in this case, he "mistakenly overlooked during [his] review that
the statement was written as if [he] had, in fact, been present
at work and during the clean-up on 7/21/2021."  Fujioka Decl. at
¶ 8; see also Concise Statement of Facts, filed 5/15/23 (dkt.
no. 134), Decl. of Corey Fujioka, dated 5/16/23 ("Fujioka
5/16/23 Decl.") at ¶¶ 7-9.b.

[9] DeGuzman and DOBOR staff continued to the "600" row on
July 22, 2021 and took photographs of slips with alleged storage
violations.  DeGuzman Decl. at ¶ 16; see also id., Exh. 21 (dkt.
no. 148-24) at 1 (one of the photographs taken on 7/22/21)

("Holtz Decl.") at ¶¶ 5-6.  Most of the live-aboard tenants whose slips were cleaned on July 21, 2021 were not present for the cleanup; Plaintiff was one of the few who were present. [DeGuzman Decl. at ¶ 9.]

Fujioka states that, "[t]o the best of [his] knowledge and recollection, the cleanup planned in connection with this notice was not aimed at Monet specifically, as harbor rules apply to all harbor tenants equally; nobody was given special treatment, that [he] know[s] of."  Fujioka Decl. at ¶ 6; see also Holtz Decl. at ¶ 7 ("We cleaned up lots of slips on July 21, 2021, not only Monet's.  And Monet specifically was not 'targeted' for cleanup.").  Plaintiff disputes this, stating Fujioka told him on July 12, 2021 that "Underwood was 'going to come after [Plaintiff] soon' and other words to that affect [sic]."  [Opp. to Defendants' Motion, Decl. of Sam Monet ("Plaintiff's Opp. Decl.") at ¶ 49.]  According to Plaintiff, "Fujioka's words [were] a direct threat and an abuse of power by Underwood, who was leveraging his official position to retaliate against [Plaintiff]."  [Id. at ¶ 51.]  Plaintiff also states that the Underwood Declaration and the Fujioka Declaration show that Underwood instructed Fujioka to treat Plaintiff and his property differently during the 7/21/21 Cleanup.  However, Plaintiff states that, because Fujioka did not come to work that day, Underwood's instructions were not relayed to Holtz.  Id. at

11

¶¶ 54-55; see also id. at ¶ 91 ("Underwood specifically instructed Fujioka to target my pier and property, with no specific instructions with respect to anyone else.").

DeGuzman states, before the crew cleaned Plaintiff's slip area, they asked him if there was anything he wanted to keep, and he removed some of his things. [DeGuzman Decl. at ¶ 10.] According to DeGuzman, Plaintiff "indicated that he did not want to keep anything that remained, which [the DOBOR crew] therefore took." [Id.] Holtz's testimony is similar to DeGuzman's, except that Holtz adds, "I remember that [Plaintiff] specifically told us that we **could** take the remaining materials, which included things like pipes, pieces of wood, wires, and other debris." [Holtz Decl. at ¶ 10.] Plaintiff denies consenting to the removal of any property, and he points out that he made a police report stating that his property was taken without his permission. [Plaintiff's Opp. Decl. at ¶¶ 60, 93, 124.]

The 7/21/21 Cleanup, as a whole, resulted in the removal of "mostly pipes, wood, and a bunch of plants (if [the crew] could carry them) – but no plants were taken from Monet's area(s) to the best of [DeGuzman's] knowledge." [DeGuzman Decl. at ¶ 11.] Holtz also states she does not recall taking any plants from Plaintiff's slips, although plants were taken from other slips. See Holtz Decl. at ¶¶ 10-11. In contrast,

12

Plaintiff points out that he testified during his deposition that a pot with his plant in it was taken during the 7/21/21 Cleanup. [Plaintiff's Opp. Decl. at ¶ 90 (citing Plaintiff's Opp. Decl., Exh. C (Witness Correction Sheet for Plaintiff's 12/15/22 deposition) at PageID.3349 (noting corrections to page 93, line 23 and page 96, line 17).] Plaintiff also states:

> My private collection of native plants used in my cultural and religious practices cannot be replaced because suffered a fall, a severely broken femur, while hiking which prevents me from ever again collecting new plants from remote areas of Oahu's native forest where these non commercial varieties can only be found.

[Id. at ¶ 57.]

In the days before a cleanup, DOBOR staff typically used an office camera to take pictures of some of the slips with storage violations, and they did so before the 7/21/21 Cleanup. [DeGuzman Decl. at ¶ 14.] On July 14, 2021, DeGuzman personally took picture of the "700" row, including Plaintiff's slips, and nearby slips. Id. at ¶ 15; see also id., Exhs. 3-5 (photos taken on 7/14/21 of Plaintiff's slips, nos. 740 and 741) (dkt. nos. 148-7 to 148-9). DeGuzman states Exhibit 4 "clearly shows that a written notice was posted to the top of dox box #741[.]" [DeGuzman Decl. at ¶ 15.a.] Defendants also submit photographs, taken on July 14, 2021, of "the slip area next to Monet's identified as #738 and #739." Id. at ¶¶ 15, 15.b; see also id., Exh. 20 (dkt. no. 148-23) at 1-3 (photos taken on 7/14/21 of

slip nos. 738 and 739).  No "after" photographs were taken immediately following the 7/21/21 Cleanup.  [DeGuzman Decl. at ¶ 15.c.]

Fujioka received an email, dated July 22, 2021, that Plaintiff sent to him, as well as to the State Attorney General, senators, representatives, and the Governor, stating: "On July 21, 2021, without cause, constructive notice or due process, DLNR agents and employees stole my property including but not limited to my tools, equipment and other expensive items.  Please return my stolen property immediately or i [sic] will make a police report."  Fujioka Decl., Exh. 8 (dkt. no. 148-11); see also Fujioka Decl. at ¶ 9.  Fujioka points out that the email does not mention plants, and Fujioka states that, "[t]o the best of [his] knowledge, no plants were taken from Monet's slip areas during the 7/21/2021 cleanup."  [Fujioka Decl. at ¶¶ 9-10.]  Underwood also states that "[n]either he, nor any other DOBOR staff took any plants belonging to Monet on July 21, 2021, or at any other time."  [Underwood Decl. at ¶ 13.]

When Fujioka returned to work after the 7/21/21 Cleanup, Underwood instructed him to ensure that items removed during the cleanup were stored in an area where harbor tenants could retrieve them, and to inform Plaintiff where the items would be and that he could retrieve them.  Fujioka Decl. at

¶¶ 11-12; see also Underwood Decl. at ¶ 12.  Fujioka did inform
Plaintiff that items taken by DOBOR staff would be held for
thirty days in the storage yard behind DOBOR's office.  [Fujioka
Decl. at ¶ 12.]  According to Holtz, they did not retain, and
instead immediately disposed of, "confiscated garbage (including
little items like tangled wires, or scraps of wood if the slip's
occupant had explicitly mentioned that they did not want those
items)."  [Holtz Decl. at ¶ 13.]  However, no plants were among
the items immediately disposed of.  See id. at ¶ 15.  Plaintiff
argues Holtz's statements about what was immediately disposed of
cannot be confirmed because of the lack of "after" pictures
immediately following the 7/21/21 Cleanup and because the crew
that conducted the cleanup did not create an itemized list of
what was taken from each slip area nor did the crew create a
list of the items that were immediately disposed of.  See
Plaintiff's Opp. Decl. at ¶¶ 87-89; see also id. at ¶ 94.
Plaintiff also argues that, because the confiscated items were
not tagged or itemized, another person could have claimed
Plaintiff's property.  [Id. at ¶ 95.]

        DeGuzman states that, in order to access the storage
yard where items removed during the 7/21/21 Cleanup were held, a
person has to pass through the DOBOR office.  If an AWSBH tenant
came to retrieve his items that were taken during the 7/21/21
Cleanup, either DeGuzman or Holtz would have given the tenant

the approval to enter the yard and retrieve his items.  DeGuzman
remembers some tenants coming to retrieve items, but he does not
remember Plaintiff coming.  [DeGuzman Decl. at ¶¶ 12-13.]  After
more than thirty days had passed, they permanently disposed of
any unclaimed items.  [Id. at ¶ 13.]  Plaintiff argues
Defendants have not presented any record showing which owners
came to the storage yard to retrieve their property nor what
property was claimed.  [Plaintiff's Opp. Decl. at ¶ 106.]

        According to Plaintiff, he requested a due process
hearing regarding the seizure of his items during the 7/21/21
Cleanup, [id. at ¶ 97 (citing Second Amended Complaint, filed
6/25/22 (dkt. no. 65), Exh. J),[10]] and he attempted to retrieve
his items from the AWSBH office, [id. ("I met with Corey Fujioka
at his AWSBH office on or about July 28, 2021, I asked Corey
'where is my stuff' because I did not see any of my property at
the harbor office site.")].  According to Plaintiff, Fujioka
responded that he did not know because he was not at work on the
day of the 7/21/21 Cleanup.  [Id. at ¶ 98.]  Although Plaintiff
has been unable to determine what happened to his property that
was removed during the 7/21/21 Cleanup, his property was not

---

[10] Exhibit J is an email, dated July 15, 2021, from
Plaintiff to Underwood, Fujioka, and others.  [Dkt. no. 65-10.]
Plaintiff's declaration also states that he requested a due
process hearing before the 7/21/21 Cleanup occurred.  See
Plaintiff's Opp. Decl. at ¶¶ 72-73.

saved at the harbor office, and it was never returned to him. [Id. at ¶¶ 99-100.]  Plaintiff argues Holtz's declaration indicates that the items taken from Plaintiff's slip area were "thrown in the back of a truck with other 'garbage' without first being inventoried and labeled," and he argues this is the reason that none of the state employees know what was actually seized from Plaintiff or what happened to those items.  [Id. at ¶¶ 59-60.]

Wood states he "did not direct anyone to conduct the harbor clean up on July 21, 2021[.]"  [Wood Decl. at ¶ 11.] Wood was aware of the posted notices regarding the removal of improperly stored items, and he cleaned up and removed any personal items around his slip.  [Id.]  According to Wood, he and Plaintiff "have had virtually no interaction," and they only spoke once during a CP harbor walk in 2021, at some point after the formation of the WG.  [Id. at ¶ 9.]  Wood states Plaintiff "attempted to provoke [him] by coming up to [him] and stating: 'Are you enjoying yourself?'  [Wood] responded, 'Yes.'  That single word is the only word [he] ha[s] ever spoken to Monet in [his] life."  [Id.]  Wood denies Plaintiff's claim that they, at some unspecified time, had a conversation during which Wood made racist comments.  [Id. at ¶ 10.]

**B.**   **Notices of Storage Violations Issued in August 2021**

DeGuzman was present when DOBOR staff took photographs of the "700" row on August 2, 2021, including the areas around slips 738 through 741.  DeGuzman Decl. at ¶ 17; see also id., Exh. 17 (photograph, taken on 8/2/21, of the area by slips 740 and 741) (dkt. no. 148-20), Exh. 20 (dkt. no. 148-23) at 4 (photograph, taken on 8/2/21, of the area by slips 738 and 739).

Fujioka and other staff prepared for another cleanup in August 2021, including drafting "more specific notices," which were dated August 4, 2021.  [Fujioka Decl. at ¶ 13.]  A Notice of Violation was prepared for Plaintiff, and it specifically identified items that were improperly stored in public areas.  [Id., Exh. 18 (dkt. no. 148-21) at 1.]  Plaintiff and seven other vessel owners were issued such notices by certified mail.  See id. at 3 (log of certified mail article numbers and fees for mail, postmarked 8/4/21, sent by DOBOR to Plaintiff and seven other persons).  The notice sent to Monet was returned unopened.  See DeGuzman Decl. at ¶ 18.b; see also id., Exh. 18 (dkt. no. 148-21) at 2 (copy of envelope addressed to Plaintiff, returned as unclaimed).  DeGuzman states that, "to the best of [his] recollection and belief, Monet was also notified of the violation via other means."  [DeGuzman Decl. at ¶ 18.b.]

DeGuzman and DOBOR staff went to AWSBH on August 6, 2021 to take "after" photographs.  Id. at ¶ 19; see also id., Exh. 19 (dkt. no. 148-22) (photograph, taken 8/6/21, of the area around slips 740 and 741), Exh. 20 (dkt. no. 148-23) at 5-6 (photographs, taken 8/6/21, of the area around slips 738 and 739).

## II.  Evidence Regarding Plaintiff's Buoy-Run Claim

Underwood states:

> In order to comply with the definition of "regularly navigated" in HRS § 200-9, DOBOR requires each vessel to be moved beyond the confines of the harbor and entrance channel once a year at permit renewal to ensure that the vessels are operational.  Although the statute requires this movement to occur every 90-days, DOBOR does not have sufficient staff to monitor vessels leaving the harbor at least once every ninety days.  Instead, DOBOR confirms compliance at the time of permit issuance or renewal.

[Underwood Decl. at ¶ 6.a.]  This seaworthiness-demonstration requirement is referred to as the "buoy run."  See id. at ¶ 6. The buoy-run required for an AWSBH permit renewal is not conducted in the Ala Wai Canal.  Each vessel is required to "exit the harbor and pass the #1 and #2 buoy of the entrance channel."  [Id. at ¶ 6.b.]  Permittees are allowed to "adjust their buoy runs based on inclement weather or other valid reasons."  [Id. at ¶ 6.d.]

Plaintiff completed the buoy-run for his 2020, 2021, and 2022 permit renewals "without incident."  Id. at ¶ 6.e; see

19

also id., Exh. 23 (three memoranda, dated 10/11/22, 9/5/21, and 9/3/20, each showing Plaintiff's satisfactory completion of the buoy-run) (dkt. no. 142-6).  Underwood states the memoranda of completion contain "nothing to suggest that storms in December 2021, or at any other time, affected Monet's ability to complete the buoy run."  [Underwood Decl. at ¶ 6.e.]  Underwood states that, in his individual capacity, he has no authority to grant an exemption from any valid administrative rule, and he has no authority to enforce the buoy-run requirement or any other rule applicable to the AWSBH.  [Id. at ¶ 7.]

Plaintiff acknowledges that the completion of the buoy run is a condition of the renewal of an AWSBH permit, [Plaintiff's Opp. Decl. at ¶ 135,] but he asserts the buoy run requirement "is not diligently, consistently or evenly enforced," [id. at ¶ 132].  Plaintiff also states that, in order to attempt a buoy run, all of the permittee's "outstanding citations must be 'closed'."  [Id. at ¶ 135.]  Plaintiff asserts the August 2021 notices of storage violations "coerced [him] to dispose of [his] plants out of fear of loosing [sic] [his] live aboard permit at the harbor because [his] buoy run was coming up in August 2023."  [Id. at ¶ 136.]

According to Plaintiff, "[f]or more than 2 years, It [sic] has sometimes been a policy at the ala wai [sic] harbor to allow boaters to certify their own buoy runs by calling in to

20

the harbor when we pass the fuel dock and again rounding the
outside channel buoy." [Id. at ¶ 146 (citing Plaintiff's Opp.
Decl., Exh. B).]  Plaintiff states Exhibit B is a photograph
that he took on May 30, 2023 of a sign posted at the AWSBH
office.  [Id. at ¶ 138.]  The sign is titled "**Buoy Run**" and
states: "Please call the office at Ph: 973-9727 when you pass
the old fuel dock and again at the #1 buoy." [Plaintiff's Opp.
Decl., Exh. B (emphasis in original).]  According to Plaintiff,
the sign "has been posted on and off at the office for several
years." [Plaintiff's Opp. Decl. at ¶ 139.]  He states harbor
office employees have informed him they do not have sufficient
staff to witness the buoy runs of the approximately 850 boats at
the AWSBH.  [Id. at ¶ 162.]  Plaintiff also asserts that some
boat owners "fake their run" at a time when "no harbor employee
is there to witness the buoy run." [Id. at ¶ 137 (citing
Plaintiff's Opp. Decl., Exh. B).]

　　　　Plaintiff states he has "witnessed several boats
dashed on the channel entrance rocks during a buoy run," and on
one occasion he assisted with the rescue of a boat that became
disabled during its buoy run.  Id. at ¶¶ 140-41; see also id. at
¶ 148 (stating Plaintiff "witnessed at least 4 boats abandoned
on the rocks at the entrance to the ala wai [sic] harbor on buoy
runs in the past 10 years, their owners had to swim to shore
once the boat began to sink").  Plaintiff also states that he

has witnessed people having to abandon their boat during a buoy run, although he states he has never had to do so himself.  [Id. at ¶ 145.]  Further, "[t]he Ala Wai Canal leads into the Ala Wai harbor basin.  Debris and hazardous materials dangerous to human health flow down the canal into the harbor basin."  Id. at ¶ 144; see also Plaintiff's CSOF at ¶¶ 3-5 (regarding V. vulnificus bacteria in the Ala Wai Canal); Plaintiff's CSOF, Exh. A ("Spikes in Ala Wai infectious bacteria influenced by rainfall" by Olivia Nigro and Grieg Steward, posted 3/14/22 on a page of the University of Hawai`i at Mānoa website); Plaintiff's CSOF at ¶ 8 (regarding hazardous waste in the Ala Wai basin waters); Plaintiff's CSOF, Exh. C (Plaintiff's December 2009 complaint to the Environmental Protection Agency).  Plaintiff has also "seen very large tiger sharks in the Ala Wai canal basin and along the rock where the boats must transit or otherwise run aground and sometimes sink on a buoy run." [Plaintiff's Opp. Decl. at ¶ 150.]

Plaintiff also argues the buoy run requirement is not necessary because no boat is ever required to leave the harbor area during weather emergencies.  See id. at ¶ 164 ("Based on my personal observations during hurricane and several tidal wave warnings at AWSBH over the last 22 years, no boats and I was never 'compelled' by any government agency or official to leave the harbor during these emergencies debunking the 'seaworthy'

22

test of the buoy run."). Plaintiff points out that AWSBH boat operators "are required [to] pass a BoatUS Foundation Boating Safety Course and obtain a U.S. Coast Guard-approved certificate," and to pass a safety inspection as a condition for renewing their mooring and live-aboard permits. [Plaintiff's CSOF at ¶¶ 9-10.] He also argues that, even if a boat sinks or is abandoned, the boat owner's insurance – which AWSBH tenants are required to have – will refloat or remove the boat at no cost to the State. See Plaintiff's Opp. Decl. at ¶¶ 155-57; see also Plaintiff's CSOF at ¶¶ 14-18 (describing the effects of "historic rainfall the first week of December 2021" and stating that Plaintiff's vessel was refloated through his insurance).

Plaintiff states he has made two requests for a waiver of the buoy-run requirement, based on his concerns and objections, but the requests have been ignored. [Plaintiff's Opp. Decl. at ¶ 166.]

## III. **Additional Evidence Presented by Plaintiff**

In 2010, Plaintiff expressed various concerns about AWSBH, including the buoy-run requirement and illegal live-aboard tenants, to Underwood and his superiors. [Plaintiff's Opp. Decl. at ¶¶ 3-4.] According to Plaintiff, he and Underwood argued, and "Underwood immediately used the power of his office and retaliated," but "Underwood was forced [to] stop" because Plaintiff "complained to Underwood's superiors[.]" [Id. at

¶ 5.]  Plaintiff believes this "formed the early basis for [Underwood's] retaliatory acts targeting [him] for alleged rule violations in July 2021."  [Id. at ¶ 6.]

Between 2010 and the incidents at issue in this case, Plaintiff made additional complaints about Underwood and other state officials.  He utilized various public information requests, written communications, email communications, and rallies to challenge issues such as the privatization of the AWSBH, the development of the area, and the elimination of free parking at the surfing area near the AWSBH.  [Id. at ¶¶ 7-10, 28.]  Plaintiff argues there is evidence that Underwood lied to the State Legislature and has used fee increases for live-aboard tenants and application fees for those seeking a live-aboard permit in an attempt to reduce and eventually eliminate the live-aboard population at AWSBH.  Id. at ¶¶ 13-16; see also Plaintiff's Opp. Decl., Exh. A (email dated 12/13/21 from Wood, sent on behalf of the AWSBH Working Group, to State Representative Tam).

Plaintiff states Underwood was the subject of a sexual harassment, assault, and retaliation complaint brought by a DLNR employee.  According to Plaintiff, the complaint was settled.  [Plaintiff's Opp. Decl. at ¶¶ 21-22.]  Plaintiff argues the claims in that case were "essentially the same as" the claims Plaintiff brings in the instant case, and Underwood's actions

described in that case were "committed at about the same time
[as] Underwood was harassing [Plaintiff]."  [Id. at ¶ 26.]

Plaintiff states Underwood has said Plaintiff "is not
his 'favorite'" and that Plaintiff "should NOT be using his
legal live aboard permit for 'housing,' but instead apply for
public housing[.]"[11]  [Id. at ¶ 119 (emphasis in original).]
Plaintiff asserts that the reference to public housing is a
racial slur and "a 'dog whistle'" to refer to people of color
who may need to live in public housing.  [Id. at ¶¶ 119-20.]

Plaintiff states that, on February 14, 2023, Underwood
told Plaintiff about a proposal to convert the parking along the
"600" and "700" piers to paid parking.  Plaintiff pointed out
that the surfers would object to the plan.  [Id. at ¶¶ 167-71.]
According to Plaintiff, Underwood responded "'nothing is free
anymore, if they cannot find free parking and don't want to pay
then they can park at Ala Moana park and paddle over.'"  [Id. at
¶ 172.]  When Plaintiff said that was not safe, Underwood
responded "'that is too bad.'"  [Id. at ¶ 174.]  Plaintiff
argues surfers who try to paddle or swim across the harbor
channel face a real danger of a shark attack.  [Id. at ¶¶ 175-
77.]  According to Plaintiff, "Underwood's statement to
[Plaintiff] 'that is too bad' is indicative of his callous

---

[11] Plaintiff does not state when Underwood made these
statements about him.  See Plaintiff's Opp. Decl. at ¶ 119.

disregard for the health and safety of [Plaintiff] and others who have a right to use our public trust asset[,]" and it is "another example of Underwood's abuse of power."  [Id. at ¶¶ 179-80.]

Plaintiff argues Wood has a conflict of interest because he was a state employee while he was part of the WG, and Wood did not disclose his employment to Plaintiff.  [Id. at ¶ 113.]  Plaintiff argues Underwood and Moriwaki improperly authorized Wood and the WG to "inspect, cite and enforce harbor rules" at AWSBH.  [Id. at ¶ 114 (internal quotation marks omitted).]  Plaintiff contends Wood used his position with the WG "to assist Underwood and Moriwaki in their plan to target [Plaintiff] for inspection, citation, enforcement and eviction." [Id. at ¶ 117.]  Plaintiff argues Wood "was motivated by his racist views and dislike of people of color."  [Id. at ¶ 118 (citing Second Amended Complaint, Exh. Q).]  However, Exhibit Q does not support Plaintiff's allegation regarding Wood's racist views because it is a photograph that Plaintiff captioned: "March 31, 2022, Customers for illegal boat charter slip 727 AWSBH, customers arguing about the poor condition of the boat, want their money back[.]"  See dkt. no. 65-17.

## IV.  **The Instant Motions**

Plaintiff's Motion seeks summary judgment in Plaintiff's favor as to Count V.  [Plaintiff's Motion at 1.]

Wood's Motion seeks summary judgment in Wood's favor as to all of Plaintiff's claims against him on the ground that he is entitled to legislative immunity.  Even if he is not entitled to legislative immunity, Wood argues Plaintiff's claims against him are without merit because they are not supported by the facts and the applicable law.  See Wood Motion, Mem. in Supp. at 2. Underwood's Motion seeks summary judgment in Underwood's favor as to all of Plaintiff's claims against him on the ground that he is entitled to qualified immunity.  In the alternative, Underwood argues Plaintiff's claims against him are unsupported by the facts and the applicable law.  See Underwood Motion, Mem. in Supp. at 2.

## DISCUSSION

## I.   Withdrawn Motion for Summary Judgment

The dispositive motions deadline in this case was May 15, 2023.  See Rule 16 Scheduling Order, filed 7/14/22 (dkt. no. 71) ("Scheduling Order"), at ¶ 6.  Defendants originally filed a Motion for Summary Judgment on May 15, 2023 ("5/15/23 Motion") with an accompanying Concise Statement of Facts ("5/15/23 CSOF").  [Dkt. nos. 133, 134.]  Also on May 15, 2021, and shortly before filing the 5/21/23 Motion and the 5/15/23 CSOF, Defendants filed a Motion to Extend Deadline to File Dispositive Motions for Summary Judgment ("Extension Motion").  [Dkt. no. 130.]  The Extension Motion stated Defendants would

comply with the May 15, 2021 deadline, but asked that the dispositive motions deadline be extended for at least one week, but no more than two months.  [Extension Motion, Mem. in Supp. at 1, 3.]  Citing the complex procedural history of this case and defense counsel's "overwhelming caseload," Defendants stated that, "despite [counsel's] exhaustive efforts to meet the deadline, she has been unable to draft adequate dispositive motions on behalf of her clients."  [Id. at 2-3.]

This Court granted the Extension Motion, finding that there was good cause to amend the Scheduling Order and extending the dispositive motions deadline to May 31, 2023.  [Minute Order, filed 5/17/23 (dkt. no. 135).]  Defendants therefore withdrew the 5/15/23 Motion and the 5/15/23 CSOF.  See Notice of Withdrawal of [133] Defendants Edward Underwood and Gordon Wood's Motion for Summary Judgment and [134] Concise Statement of Facts, Including All Materials Filed in Support, All of Which Were Filed on May 15, 2023, filed 5/19/23 (dkt. no. 138).

Plaintiff states he informed Defendants' counsel of errors in the supporting materials for the 5/15/23 CSOF, and counsel admitted rushing to file the motion to meet the May 15, 2023 dispositive motions deadline.  [Plaintiff's Opp. Decl. at ¶¶ 61-62.]  Plaintiff argues the difference between the current Fujioka Declaration and the Fujioka 5/16/23 Declaration "casts doubt on the reliability of all the declarations [Defendants]

28

filed." [Id. at ¶ 66.]  Plaintiff accuses Defendants' counsel of "coerc[ing] Fujioka to certify . . . false statements in the first declaration" and, in the current Fujioka Declaration, "to wrongly admit that he made the mistake . . . ."  [Id. at ¶ 70.]

This Court granted Defendants leave to file additional dispositive motions to replace the 5/15/23 Motion and to file additional statements of fact, with supporting documentation, to replace Defendants' 5/15/23 CSOF.  Defendants stated in the Extension Motion that their counsel had been unable to draft "adequate" dispositive motions.  See Extension Motion, Mem. in Supp. at 3.  Although there was an error in the Fujioka 5/16/23 Declaration, the current declarations explain, under penalty of perjury, the circumstances of that error.  See Fujioka Decl. at ¶ 8; Goldman Decl. at ¶¶ 3-3.e.[12]  Plaintiff merely speculates that there were nefarious reasons behind the difference between the 5/16/23 Fujioka Declaration and the current Fujioka Declaration.  Because Plaintiff has not presented any evidence to support his speculative theory, in ruling on the motions currently before it, this Court will not consider the 5/16/23 Fujioka Declaration, or any other materials attached to Defendants' 5/15/23 CSOF.

---

[12] The Goldman Declaration is misnumbered, and this citation refers to the second paragraph number 3 and its subparagraphs. See Goldman Decl. at PageID.2959-60.

## II. **Legislative Immunity**

This Court has previously noted:

> Under the doctrine of legislative immunity, members of Congress and state legislators are entitled to absolute immunity from civil damages for their performance of lawmaking functions. See Tenney v. Brandhove, 341 U.S. 367, 376-77, 379, 71 S. Ct. 783, 95 L. Ed. 1019 (1951) (finding that state legislators were absolutely immune from damages when acting within the "sphere of legitimate legislative activity"). Legislative immunity, however, is not limited to officials who are members of legislative bodies. See Cleavinger v. Saxner, 474 U.S. 193, 201, 106 S. Ct. 496, 88 L. Ed. 2d 507 (1985) ("Absolute immunity flows not from rank or title or 'location within the Government,' but from the nature of the responsibilities of the individual official." (citation omitted) (quoting Butz v. Economou, 438 U.S. 478, 511, 98 S. Ct. 2894, 57 L. Ed. 2d 895 (1978))). "[O]fficials outside the legislative branch are entitled to legislative immunity when they perform legislative functions." Bogan v. Scott-Harris, 523 U.S. 44, 55, 118 S. Ct. 966, 140 L. Ed. 2d 79 (1998).

> Thus, under this functional approach, the Supreme Court has held that legislative immunity does not depend on the actor so much as the functional nature of the act itself. See id. at 54-55, 118 S. Ct. 966 ("Absolute legislative immunity attaches to all actions taken 'in the sphere of legitimate legislative activity.'" (quoting Tenney, 341 U.S. at 376, 71 S. Ct. 783)).

[Order Granting Defendants' Motion to Dismiss [001] Complaint

Filed August 30, 2021, filed 1/11/22 (dkt. no. 33) ("1/11/22

Order"),[13] at 15–16 (quoting <u>Jones v. Allison</u>, 9 F.4th 1136, 1139–40 (9th Cir. 2021) (alteration in <u>Jones</u>)).]

In the order granting in part and denying in part the defendants' motion to dismiss Plaintiff's First Amended Complaint, this Court denied the defendants' request to dismiss Plaintiff's claims against Wood based on legislative immunity. [5/31/22 Order at 18.]

> Plaintiff also alleges there is no evidence that the AWSBH Working Group was created by the State Legislature, [First Amended Complaint at ¶¶ 96-98,] and it was Underwood who appointed Wood as the chairperson of the AWSBH Working Group, [<u>id.</u> at ¶ 100]. Plaintiff therefore argues Wood is not entitled to legislative immunity because Underwood is not a legislative official. <u>See id.</u> at ¶ 101. The factual allegations in the First Amended Complaint must be accepted as true for purposes of the State Defendants' Motion. <u>See</u> [<u>Ashcroft v.</u>] <u>Iqbal</u>, 556 U.S. [662,] 678 [(2009)] (stating "for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true"). Based on the factual allegations in the First Amended Complaint, Plaintiff has pled a plausible basis to support his position that Wood is not entitled to legislative immunity.

[<u>Id.</u> at 17–18.] Wood, however, was permitted to reassert legislative immunity in a motion for summary judgment or at trial, if warranted by the evidence. <u>See id.</u> at 18.

In her declaration, signed under penalty of perjury, Senator Moriwaki states:

---

[13] The 1/11/22 Order is also available at 2022 WL 105194.

>     8.    I believed that it would be helpful to
>     both the DOBOR and my role as Legislator to form
>     an AWSBH Working Group ("WG") comprised of
>     private citizens like the CP members, as well as
>     representatives of the DOBOR to work towards
>     developing proposed legislation to improve the
>     safety and cleanliness of the harbor.
>
>     9.    The purpose of the WG would be to
>     address problems and encourage enforcement of
>     rules to improve the harbor; improve
>     communication between DOBOR and stakeholders,
>     generate potential legislation to address the
>     problems, and encourage community-based solutions
>     to problems.

[Moriwaki Decl. at pgs. 2-3.]  In May 20, 2021, Senator Moriwaki

suggested to Underwood and Jason Redulla ("Redulla") that they

should "meet with the AWSBH constituents to share results from

the [Legislative] session and what it will mean for them."

[Id., Exh. 24 (email, dated 5/20/21, from Moriwaki to Underwood,

Redulla, and others) (dkt. no. 148-24).]  Underwood, Fujioka,

and Robert Matsuda ("Matsuda") agreed to start the Working

Group, but Moriwaki identified the six AWSBH tenants, including

Wood, who would be part of the Working Group.  See id., Exh. 25

(email, dated 6/26/21 from Moriwaki to Masuda, Underwood, and

Fujioka, forwarding an email, dated 6/26/21 to Moriwaki from

Patricia Wood) (dkt. no. 148-27) at 1 ("Membership of the

'working group' be the 6 listed below. . . . Only members of the

CP should be members.").  The Working Group started following a

July 1, 2021 meeting facilitated by Senator Moriwaki.  See id.,

Exh. 26 (emails, dated 7/2/21 between Moriwaki, Underwood, and

others, regarding the subject "AWSBH Meeting on July1 leads to AWSBH Working Group") (dkt. no. 148-28). Plaintiff has not identified any evidence contradicting Defendants' evidence that Senator Moriwaki, acting within her legislative duties, started the AWSBH Working Group.

"Encourag[ing] enforcement of rules to improve" AWSBH was one of purposes of the Working Group. See Moriwaki Decl. at ¶ 9. This type of law enforcement activity is not a legislative function, and therefore legislative immunity would not apply. Cf. Bogan, 523 U.S. at 55 (stating the petitioner's "actions were legislative because they were integral steps in the legislative process" (citations omitted)). Plaintiff alleges that, as part of the Working Group's enforcement authority, Wood "assist[ed] Underwood . . . in their plan to target [Plaintiff] for inspection, citation, enforcement and eviction." [Plaintiff's Opp. Decl. at ¶ 117.] However, other than his own declaration, Plaintiff has not presented any evidence suggesting that Wood was involved in either the 7/21/21 Cleanup,[14] the noticed August 2021 cleanup, or the enforcement of the buoy-run requirement. Plaintiff's statement is insufficient to raise a genuine issue of material fact for trial. See Fed. R. Civ.

---

[14] Wood has expressly denied that he "directed anyone to conduct the harbor clean up on July 21, 2021[.]" [Wood Decl. at ¶ 11.]

P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."); Nigro v. Sears, Roebuck & Co., 784 F.3d 495, 497 (9th Cir. 2015) ("[A] self-serving declaration does not always create a genuine issue of material fact for summary judgment. The district court can disregard a self-serving declaration that states only conclusions and not facts that would be admissible evidence").

Wood has presented evidence that he participated in the Working Group's "draft[ing of] proposed legislation that [they] provided to Senator Moriwaki for her consideration in late 2021." Wood Decl. at ¶ 8; see also Wood Decl., Exhs. 28-32 (emails, dated from 11/14/21 to 12/20/21, between Wood and Moriwaki regarding the proposed legislation drafted by the Working Group) (dkt. nos. 148-30 to 148-35). Plaintiff appears to concede that Wood has participated in the drafting of proposed legislation regarding the AWSBH. See Opposition to Defendants' Motions at 15 (stating Underwood and Wood "write new rules and lobby the legislature to pass their rules").

Thus, even viewing the record in the light most favorable to Plaintiff,[15] this Court finds that there are no

---

[15] In considering a motion for summary judgment, this Court must view the record in the light most favorable to the nonmoving party. See Harris v. Cnty. of Orange, 17 F.4th 849,

(. . . continued)

34

genuine issues of material fact as to Wood's participation in in

the Working Group's drafting of proposed legislation, and that

there are no genuine issues of material fact as to Wood's lack

of involvement in the 7/21/21 Cleanup, the noticed August 2021

cleanup, or the enforcement of the buoy-run requirement.  This

Court therefore finds that Wood's only relevant conduct is his

participation in the drafting of legislation that could have

affected the AWSBH.  Because the drafting of legislation is a

function that is normally performed by the legislature, Wood is

entitled legislative immunity.  See Bogan, 523 U.S. at 55.  Wood

is entitled to judgment as a matter of law as to all of

Plaintiff's claims against him.[16]  Wood's Motion is therefore

granted.

### III. **Qualified Immunity**

This Court has previously noted:

Qualified immunity "shields government officials
performing discretionary functions from liability
for civil damages 'insofar as their conduct does
not violate clearly established statutory or
constitutional rights of which a reasonable
person would have known.'"  Scott v. Henrich, 39
F.3d 912, 914 (9th Cir. 1994) (quoting Harlow v.
Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727,

---

855 (9th Cir. 2021).  For purposes of Wood's Motion, Plaintiff
is the nonmoving party.

[16] In light of the ruling that Wood is entitled to summary
judgment as to all of Plaintiff's claims against him because he
is entitled to legislative immunity, it is not necessary for
this Court to address the other arguments raised in Wood's
Motion.

73 L. Ed. 2d 396 (1982)).  When an officer claims qualified immunity, we ask "(1) whether there has been a violation of a constitutional right; and (2) whether that right was clearly established at the time of the officer's alleged misconduct." Jessop v. City of Fresno, 936 F.3d 937, 940 (9th Cir. 2019) (quoting Lal v. California, 746 F.3d 1112, 1116 (9th Cir. 2014)).  Courts have discretion to decide which of the two prongs "should be addressed first in light of the circumstances in the particular case at hand." Pearson v. Callahan, 555 U.S. 223, 236, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009).  "Addressing the second prong before the first is especially appropriate where 'a court will rather quickly and easily decide that there was no violation of clearly established law.'"  Jessop, 936 F.3d at 940 (quoting Pearson, 555 U.S. at 239, 129 S. Ct. 808).

[5/31/22 Order at 36 (quoting Saved Mag. v. Spokane Police Dep't, 19 F.4th 1193, 1198 (9th Cir. 2021)).[17]]

A.   **Clearly Established**

The Ninth Circuit has stated:

As the Supreme Court explained, . . . "clearly established law must be 'particularized' to the facts of the case."  White v. Pauly, -- U.S. --, 137 S. Ct. 548, 552, 196 L. Ed. 2d 463 (2017) (quoting Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)).  If this is not done, "[p]laintiffs would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." Anderson, 483 U.S. at 639, 107 S. Ct. 3034.

---

[17] The Supreme Court denied the petition for writ of certiorari.  Saved Mag. v. Spokane Police Dep't, 142 S. Ct. 2711 (2022).

Saved Mag., 19 F.4th at 1199 (brackets in Saved Mag.).  In evaluating Underwood's assertion of qualified immunity, the issue is whether "the right asserted by [Plaintiff was] so clearly established that a reasonable [state official] would have known that his conduct violated that right?"  See id. (citation and internal quotation marks omitted).

Count I alleges Underwood violated Plaintiff's right to the free exercise of his religion because Underwood is liable for July 21, 2021 seizure of Plaintiffs' plants and other items used in his cultural and religious practices and for Plaintiff's disposal of similar items after he received notice of the impending August 2021 cleanup.  See generally Second Amended Complaint at ¶¶ 204-13.  Plaintiff does not describe the specific religious practices he engages in that involved the native plants allegedly taken from him.  See Plaintiff's Opp. Decl. at ¶ 57 ("My private collection of native plants used in my cultural and religious practices cannot be replaced . . . .").  However, viewing the record in the light most favorable to Plaintiff, this Court will assume that he used the native plants in a religious practice that is protected by the First Amendment.  Cf. Sause v. Bauer, 138 S. Ct. 2561, 2562 (2018) (per curiam) ("There can be no doubt that the First Amendment protects the right to pray.  Prayer unquestionably constitutes the 'exercise' of religion.").  However,

> there are clearly circumstances in which a police
> officer may lawfully prevent a person from
> praying at a particular time and place.  For
> example, if an officer places a suspect under
> arrest and orders the suspect to enter a police
> vehicle for transportation to jail, the suspect
> does not have a right to delay that trip by
> insisting on first engaging in conduct that, at
> another time, would be protected by the First
> Amendment.

Id. at 2562-63.

The record in this case establishes that, prior to the
7/21/21 Cleanup, Plaintiff had notice that his plants and other
items were in violation of Haw. Admin. R. §§ 13-262-40(b) and
13-262-41.  See Fujioka Decl. at ¶ 5; id., Exh. 2 (dkt. no. 148-
6) at 1 (Notice of Violation for Storage on Harbor Grounds,
dated 7/14/21, produced by Plaintiff); see also Plaintiff's Opp.
Decl. at ¶ 72 ("Prior to the seizing or confiscation of my
property by harbor employees, I called DLNR seeking a due
process hearing . . . .").  Where the plaintiff's religious
items were stored in violation of applicable rules, and the
plaintiff is given notice of such violation and time to move the
items, this Court cannot conclude that the subsequent removal of
the religious items violated a clearly established right.[18]

---

[18] Defendants have taken the position that no plants were
removed from the area around Plaintiff's slips.  See, e.g.,
Underwood Decl. at ¶ 13.  Plaintiff, however, contends his
plants were removed.  See, e.g., Plaintiff's Opp. Decl. at ¶ 90.
In considering the parties' motions for summary judgment, this
Court cannot weigh the credibility of these statements.  See
(. . . continued)

Underwood is therefore entitled to qualified immunity as to Plaintiff's claim in Count I.[19]

In the 5/31/22 Order, this Court noted, as to the portion of Plaintiff's due process claim based on the 7/21/21 Cleanup, that "the right to procedural due process associated with a state's seizure of property is well established." [5/31/22 Order at 37 (citing Clement v. City of Glendale, 518 F.3d 1090, 1093-94 (9th Cir. 2008) (discussing notice and hearing requirements)).]  The due process claim at issue in the 5/31/22 Order is similar to Count II in the Second Amended Complaint.  Compare First Amended Complaint at ¶¶ 105-65, with Second Amended Complaint at ¶¶ 214-22.  This Court also concludes that the rights at issue in Count II of the Second Amended Complaint were clearly established at the time of the events that form the basis of that claim.

---

Estate of Lopez ex rel. Lopez v. Gelhaus, 871 F.3d 998, 1009 n.10 (9th Cir. 2017) ("At the summary judgment stage, '[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" (alteration in Lopez) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986))).  Therefore, viewing the record in the light most favorable to Plaintiff, this Court will assume, for purposes of the Underwood Motion, that Plaintiff's plants were taken during the 7/21/21 Cleanup.

[19] To the extent that Count I alleges Plaintiff was denied pre-deprivation and/or post-deprivation due process, this Court construes those allegations as a reference to Plaintiff's claim in Count II and does not consider those allegations as a theory of liability for Count I.

Count III alleges that Underwood violated Plaintiff's rights under the First and Fourteenth Amendment by targeting Plaintiff in the 7/21/21 Cleanup because of Plaintiff's race and because of his prior complaints about Underwood and conditions at the AWSBH.  See generally Second Amended Complaint at ¶¶ 223-32.  It is clearly established that selective enforcement based on impermissible grounds is prohibited.  See, e.g., Brown v. Dunbar, 376 F. App'x 786, 788 (9th Cir. 2010) (citing Squaw Valley Dev. Co. v. Goldberg, 375 F.3d 936, 944 (9th Cir. 2004), overruled on other grounds as stated in Action Apartment Ass'n, Inc. v. Santa Monica Rent Control Bd., 509 F.3d 1020, 1025 (9th Cir. 2007)).  This Court therefore concludes that the rights at issue in Count III were clearly established at the time of the events that form the basis of that claim.

In addressing the abuse of process claim in the First Amended Complaint, this Court noted: "it is unclear whether an abuse of process claim is cognizable under § 1983 and, if so, what the elements of the claim are."  [5/31/22 Order at 30 (citing Hall v. City & Cnty. of Honolulu, CIV. NO. 21-00248 LEK-KJM, 2022 WL 1229965, at *7-8 (D. Hawai`i Apr. 26, 2022)).[20]]  In light of the uncertainty regarding § 1983 abuse of process

---

[20] Hall, 2022 WL 1229965, was reversed and remanded by the Ninth Circuit on other grounds.  See Hall v. Maioho-Pohina, No. 22-15698, 2023 WL 3220909 (9th Cir. May 3, 2023).

claims, this Court cannot conclude that the constitutional
rights at issue in Count IV of Plaintiff's Second Amended
Complaint were so clearly established that a reasonable state
official in Underwood's position would have known that his
conduct violated those rights.  Underwood is therefore entitled
to qualified immunity as to Plaintiff's claim against him in
Count IV.

In Count V, Plaintiff "seeks and [sic] order from this
Court compelling DLNR to grant a hearing or in the alternative
grant [his] request to waive [the] buoy run requirement."
[Second Amended Complaint at ¶ 279.]  This Court liberally
construes this as seeking an injunction compelling Underwood
either to grant the request for a waiver of the buoy-run
requirement that Plaintiff previously presented, see Plaintiff's
Opp. Decl. at ¶ 166, or to convene an administrative hearing
regarding Plaintiff's request.  See Underwood Decl. at ¶ 1
(stating Underwood is the Administrator of DOBOR, which is part
of DLNR).  However, Underwood is only being sued in his
individual capacity.  See Second Amended Complaint at ¶ 4.
Underwood states:

> As an individual, I have no authority to
> authorize an exemption or exception for any valid
> administrative rule, such as those applicable to
> the AWSBH.  I also have no authority, outside of
> my official role as DOBOR Administrator, to
> require liveaboard tenants to complete a buoy
> run, or to comply with any other AWSBH rules.

41

[Underwood Decl. at ¶ 7.]  Plaintiff has not identified any evidence contesting this.

In his original complaint, Plaintiff sued Underwood in his individual and official capacities.  See Complaint at pg. 1. In the 1/11/22 Order, this Court dismissed with prejudice Plaintiff's federal law claims seeking damages or any other form of retrospective relief against Underwood and the other state official defendants, in their official capacities ("State Official Defendants"), because such claims were barred by their Eleventh Amendment immunity.  [1/11/22 Order at 13.] Plaintiff's claims seeking prospective injunctive relief against the State Official Defendants were dismissed for failure to state a claim, but the dismissal was without prejudice.  [Id. at 14-15.]  Plaintiff, however, chose not to pursue any claim against Underwood in his official capacity.  See First Amended Complaint at ¶ 28 ("Defendant Edward Underwood, is being sued as an individual." (emphasis omitted)).

In light of Underwood's lack of authority as an individual to make decisions regarding the buoy-run requirement, this Court cannot conclude that the constitutional rights at issue in Plaintiff's Count V were so clearly established that Underwood, in his individual capacity, would have known that his conduct violated Plaintiff's rights.  Plaintiff arguably could

42

have pursued Count V against Underwood in his official capacity, but Plaintiff elected not to do so.  Underwood is therefore entitled to qualified immunity as to Plaintiff's claim in Count V.

   **B.    Constitutional Violation**

       Underwood has stated that he was present at the AWSBH for the 7/21/21 Cleanup.  [Underwood Decl. at ¶ 11.]  Plaintiff has not presented any evidence to contest this.  This district court has stated:

> There is no *respondeat superior* liability under 42 U.S.C. § 1983.  Vazquez v. Cnty. of Kern, 949 F.3d 1153, 1166 (9th Cir. 2020). . . .
>
> "A supervisory official may be held liable under § 1983 only if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." Keates v. Koile, 883 F.3d 1228, 1242–43 (9th Cir. 2018) (internal quotation marks and citations omitted).  "The requisite causal connection can be established by setting in motion a series of acts by others, or by knowingly refusing to terminate a series of acts by others, which the supervisor knew or reasonably should have known would cause others to inflict a constitutional injury." Felarca v. Birgeneau, 891 F.3d 809, 820 (9th Cir. 2018) (internal quotation marks and citations omitted).  "Thus, a supervisor may be liable in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others." Rodriguez v. Cnty. of Los Angeles, 891

F.3d 776, 798 (9th Cir. 2018) (internal quotation
marks and citation omitted).

Coates v. Cluney, Civ. No. 23-00122 JMS-WRP, 2023 WL 2958327, at
*5 (D. Hawai`i Apr. 14, 2023).

Plaintiff appears to contend that Underwood is liable
for the damages Plaintiff allegedly suffered as a result of the
7/21/21 Cleanup and the August 2021 notices because Underwood
planned the cleanup efforts to target Plaintiff.  The only
evidence Plaintiff presents to support his position is his
statement that Fujioka told him on July 12, 2021 that "Underwood
was 'going to come after [Plaintiff] soon' and other words to
that affect [sic]."[21]  See Plaintiff's Opp. Decl. at ¶ 49.  Even
viewing it in the light most favorable to Plaintiff, this vague
statement is insufficient to raise a genuine issue of material
fact for trial as to the issue of whether there is a causal
connection between Underwood's conduct and Plaintiff's alleged
constitutional violation.  The DOBOR crew cleaned approximately
twenty to thirty slips during the 7/21/21 Cleanup, and they
stopped when the trucks were full.  [DeGuzman Decl. at ¶¶ 7-8.]
Additional slips were cleaned the next day.  [Id. at ¶ 16.]  As

---

[21] Plaintiff has described a long history of he and
Underwood being on opposite sides of multiple issues and
complaints, and it appears that there may be personal animosity
between them.  See, e.g., Plaintiff's Opp. Decl. at ¶¶ 3-10.
However, such circumstances do not constitute evidence that
Underwood targeted Plaintiff in either the 7/21/21 Cleanup or
the cleanup that was planned for August 2021.

to the August 2021 notices regarding another planned cleanup,
Plaintiff was one of eight vessel owners that were sent notices
that their slips were in violation.  See Fujioka Decl. at ¶ 13;
id., Exh. 18 (dkt. no. 148-21) at 1, 3 (Plaintiff's notice and a
log of certified mail article numbers and fees for mail,
postmarked 8/4/21, sent by DOBOR to Plaintiff and seven other
persons).  Plaintiff has therefore failed to raise a genuine
issue of fact for trial as to his allegation that Underwood
planned the AWSBH cleanups to target Plaintiff.

          Underwood states that, after the 7/21/21 Cleanup, he
instructed DOBOR staff to make the items that were removed
available for tenants to retrieve, and he specifically
instructed the staff to let Plaintiff know that he could
retrieve his items.  [Underwood Decl. at ¶ 12.]  Plaintiff was
aware of the opportunity to retrieve items and attempted to do
so.  See Plaintiff's Opp. Decl. at ¶¶ 97, 99.  However, he
asserts he was unable to do so because items that were removed
were not properly labeled and itemized.  Therefore, someone else
could have taken his property, or some of his items may have
been improperly disposed of as perceived garbage.  See id. at
¶¶ 95-96.  Plaintiff has not identified any evidence which
suggests that there was a causal connection between any actions
or omissions by Underwood and the conduct that resulted in
Plaintiff's inability to retrieve his items.  Plaintiff has

failed to raise a genuine issue of fact for trial as to his allegation that Underwood is responsible for Plaintiff's inability to retrieve his items that were removed during the 7/21/21 Cleanup.

Plaintiff has failed to identify a genuine issue of fact for trial as to the question of whether Underwood violated his due process rights or his right to equal protection.  This Court therefore concludes, as a matter of law, that Underwood is entitled to qualified immunity as to Counts II and III because there was no constitutional violation.

This Court has granted summary judgment in favor of Underwood as to all of Plaintiff's claims against him, based on qualified immunity.  Therefore, Underwood's Motion is granted, and it is not necessary to address the remaining issues raised in Underwood's Motion.

## IV. **Plaintiff's Motion**

Because Wood's Motion and Underwood's Motion have been granted, there are no remaining claims in this case. Plaintiff's Motion is therefore denied as moot.

## CONCLUSION

For the foregoing reasons, Wood's Motion for Summary Judgment and Underwood's Motion for Summary Judgment, both filed May 31, 2023, are HEREBY GRANTED, and summary judgment is granted in favor of Wood and Underwood as to all of Plaintiff's

claims against them.  In light of those rulings, Plaintiff's Motion for Partial Summary Judgment as to Count V, filed April 10, 2023, is DENIED AS MOOT.

There being no remaining claims in this case, the Clerk's Office is DIRECTED to enter judgment and close the case on **November 15, 2023,** unless Plaintiff files a timely motion for reconsideration of this Order.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAII, October 31, 2023.



/s/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States District Judge

**SAM MONET VS. STATE OF HAWAII, ET AL; CV 21-00368 LEK-KJM; ORDER:  DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO COUNT V; GRANTING DEFENDANT GORDON WOOD'S MOTION FOR SUMMARY JUDGMENT; AND GRANTING DEFENDANT EDWARD UNDERWOOD'S MOTION FOR SUMMARY JUDGMENT**